**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA**,

    Plaintiff,

vs.                                                          No. CR 07-794 MCA

**SERGIO ALMEDA-TERAN,**

    Defendant.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Defendant's Motion to Suppress and Memorandum in Support Thereof* [Doc. 17], filed May 17, 2007. On June 20, 2007 and June 21, 2007, the Court held an evidentiary hearing on Defendant's motion. Having fully considered the pleadings of record, the applicable law, the evidence and arguments of counsel presented at the hearing, and otherwise being fully advised in the premises, the Court denies the *Motion*, based upon the following findings of fact and conclusions of law.

### I. FINDINGS OF FACT

    **A. The Issue of the Temporary Tag**

        **Testimony of Deputy Paul Chavez**

1. Paul Chavez is a deputy with the Bernalillo County Sheriff's Office ("BCSO"), assigned to the Traffic Investigations Unit.

2. Deputy Chavez has been employed by the BCSO for approximately a decade and has worked with the Traffic Investigations Unit/DWI Unit for the last six years.

3. In addition, Deputy Chavez serves as a traffic-investigator instructor for the Law

Enforcement Academy.

4. From his training and experience, Deputy Chavez has become familiar with the rules relating to the operation of motor vehicles in the State of New Mexico.

5. Deputy Chavez speaks both Spanish and English.

6. On Friday, January 26, 2007, Deputy Chavez was working a 7:00 p.m. to 11:00 p.m. "saturation patrol" in the south valley area of Albuquerque

7. Deputy Chavez works saturation patrols to earn overtime pay.

8. A saturation patrol involves saturating a specific area of town, looking for any and all traffic violations.

9. One purpose of saturation patrols is to create a police presence in a particular community.

10. The BCSO receives federal grant money to conduct saturation patrols, with the grant money being tied to the success of the patrols.

11. Before reporting to the saturation patrol on January 26, 2007, Deputy Chavez had already worked his regular 10:00 a.m. to 6:00 p.m. shift.

12. By the end of his saturation patrol, therefore, Deputy Chavez had worked a 12-hour day.

13. When Deputy Chavez works a saturation patrol, he does not issue a traffic citation for every vehicle he stops. However, there are infractions for which he will not issue just a warning, including excessive speeding; lack of insurance and/or registration; failure to wear seatbelts; driving with a revoked or suspended license; and driving while

intoxicated.

14. Deputy Chavez is familiar with vehicle-registration requirements in the State of New Mexico, including those relating to temporary paper tags.

15. According to Deputy Chavez, when an individual buys a new or used car from an authorized dealer, the dealer supplies a temporary paper tag that is valid for 30 days. This tag is "supposed to be displayed on the left-hand side of the windshield or the back window." [Suppression hearing testimony of Paul Chavez]. It is the responsibility of the owner or driver of the vehicle to secure permanent registration of the vehicle.

16. At approximately 11:00 p.m. on January 26, 2007, Deputy Chavez stopped a 2001 white Dodge Neon because there was no license plate on the back bumper and, according to him, no visible temporary tag in the rear window.

17. The combined effect of the late hour and the Neon's tinted and angled rear window prevented Deputy Chavez from seeing through the Neon's back window from his patrol unit.

18. After the Neon stopped, Deputy Chavez approached on foot.

19. As he approached, Deputy Chavez shined his flashlight through the back window to make sure nobody but the driver, the Defendant in this matter, was in the car. With the aid of his flashlight, Deputy Chavez could see there was a temporary tag in the back window.

20. At this point, Deputy Chavez determined that his primary concern was officer safety;

for that reason, he did not determine or attempt to determine at this time whether the tag was valid or expired.

21. Deputy Chavez is aware that New Mexico law requires that a temporary tag be affixed to the rear left window, making it visible from behind.

22. According to Deputy Chavez, at the time he stopped the vehicle the tag "was affixed by the top edge, making it like a curtain, hanging. The other three edges were hanging away from the window." [Chavez testimony].

23. Deputy Chavez also described the tag as "dangling." [Id.].

24. I find and accept as credible Deputy Chavez's testimony that the temporary tag was hanging as described; I further find that the temporary tag was neither securely adhered nor firmly affixed to the Neon's rear window, such that it was clearly visible.

### Testimony of Lilliana Veleta

25. Lilliana Veleta is the owner of the 2001 white Dodge Neon that is at issue in this case.

26. Ms. Veleta considers Defendant to be her common-law husband.

27. Ms. Veleta and Defendant have been involved for approximately one year and, at the time of the stop at issue here, the couple had been living together for about two months.

28. Defendant helps Ms. Veleta pay her bills.

29. Ms. Veleta confirmed that Defendant was driving her Neon on the night of January 26, 2007.

30. Ms. Veleta testified that she bought the Neon in September 2006 in Farmington, New

Mexico; when she did, she received a temporary tag.

31. An employee of the lot from which Ms. Veleta bought the vehicle affixed the temporary tag to the rear, left-hand side of the back window with tape.

32. Ms. Veleta never received a permanent license plate for the car because there were issues with the seller's title. For that reason, the seller continued to send Ms. Veleta new temporary permits.

33. According to Ms. Veleta, each time she replaced a temporary tag, she affixed the new one in the same spot from which she had just removed the old one, using the existing tape marks as a guide.

34. Ms. Veleta testified that she had affixed the temporary tag on the rear window of the Neon with "[t]wo thick pieces of tape, one at the top and one at the bottom." [Suppression hearing testimony of Lilliana Veleta].

35. Ms. Veleta also testified that she used the Neon all day on January 26, 2007, and noticed that the permit "was stuck on well with tape." [Veleta testimony].

36. Exhibits A and B depict the Neon that Deputy Chavez stopped on January 26, 2007. [Exhs. A, B].

37. At the suppression hearing, Ms. Veleta examined Exhibits A and B and confirmed that the pictures comprising those exhibits depict her vehicle. She also testified that the tag shown in the photographs was displayed in the same *manner* as it was affixed to the rear window of the Neon when she drove it on January 26, 2007.

38. Ms. Veleta also testified, however, that when law enforcement authorities returned the

Neon to her after Defendant's arrest, "[t]here wasn't any permit on it." [Veleta testimony].

39. It is reasonable to infer that Ms. Veleta repositioned the temporary tag on the rear window when she retrieved the car.

40. I find that Ms. Veleta has both a personal and a financial interest in preventing Defendant's possible deportation; for this reason, I accord little weight to her steadfast testimony as to the *precise* placement of the temporary tag on the *night* of January 26, 2007, prior to Defendant's arrest, and some hours after she yielded control of the vehicle to Defendant.

### B. The Issue of Defendant's Concealed Identity

41. Once Deputy Chavez had stopped the Neon, he immediately approached the vehicle to speak with the driver.

42. Deputy Chavez introduced himself to Defendant in English, and told him that he was stopped because the temporary tag was not properly affixed.

43. When it became apparent that Defendant did not understand, Deputy Chavez switched to Spanish.

44. Deputy Chavez then asked to see Defendant's driver's license, insurance papers, and registration certificate.

45. Defendant did not have any of the documents Deputy Chavez asked for, although he told Deputy Chavez that he was licensed in Texas.

46. Additionally, Defendant identified himself as "Marcos Gutierrez."

47. At the suppression hearing, Defendant admitted that he lied to Deputy Chavez about his name.

48. Defendant explained that he lied about his name because he had previously been deported and feared he was about to be separated from his wife.

49. When Deputy Chavez asked to see documentation of identity, Defendant said he had none.

50. At the hearing, Defendant confirmed that he had no identification with him when he was stopped by Deputy Chavez.

51. This lack of identification caused Deputy Chavez to believe that Defendant either had a number of traffic tickets or an outstanding warrant.

52. Deputy Chavez then asked Defendant for his date of birth and his Social Security number.

53. Defendant did not have a Social Security number, but gave Deputy Chavez a date of birth, which Deputy Chavez then took back to his patrol and entered in his Mobile Data Terminal ("MDT").

54. Deputy Chavez learned that there was a possible warrant on an individual named "Marcos Gutierrez" with a birth date similar, but not identical, to the one provided by Defendant.

55. The difference between the date of birth provided by Defendant and the one that was returned by Deputy Chavez's MDT was the birth year.

56. Deputy Chavez returned to the Neon and, for purposes of officer safety, asked

Defendant to step out of the car.

57. Deputy Chavez told Defendant that he was having trouble locating his name in computer systems from either Texas or New Mexico; accordingly, he asked Defendant to repeat the information he had already given.

58. When Defendant repeated the information, he gave a year of birth that matched the year returned by Deputy Chavez's MDT, as well as that of the individual with the possible warrant.

59. At this point, Deputy Chavez believed Defendant was "a wanted person" and handcuffed him. [Chavez testimony].

60. Deputy Chavez's standard operating procedure allows him to confirm a warrant with two identifiers, although he testified that he "continues to . . . look for that third magical identifier." [Id.]. To that end, Deputy Chavez asked Defendant if there was anybody who could identify him.

61. Deputy Chavez then called a telephone number supplied by Defendant and spoke to a woman Defendant identified as his wife.

62. The woman to whom Deputy Chavez spoke was Lilliana Veleta, and she confirmed both that the white Neon was hers and that her husband was driving it.

63. Ms. Veleta identified her husband as "Sergio Beltran."

64. At the suppression hearing, Ms. Veleta testified that at the time she received Deputy Chavez's call, she believed Defendant's name to be Sergio Beltran.

65. Because the name provided by Ms. Veleta did not match any of the identifiers

Defendant had given Deputy Chavez, he became even more suspicious as to Defendant's true identity and described to Ms. Veleta the clothes Defendant was wearing.

66. Ms. Veleta confirmed that Defendant was dressed as described and asked Deputy Chavez what had happened.

67. Deputy Chavez informed Ms. Veleta that he had made a traffic stop but had no idea who was driving the car; he then ended the conversation with Ms. Veleta.

68. Deputy Chavez next told Defendant that his wife had identified him as "Sergio."

69. Defendant again stated that his name was Marcos, but as Deputy Chavez escorted him to his patrol unit, Defendant admitted his name was Sergio.

70. Deputy Chavez, who had been in the process of arresting Defendant as "Marcos Gutierrez," then arrested Defendant for concealing identity.

71. According to Deputy Chavez, had Defendant been able to produce his driver's license and proof of insurance when asked to do so, Deputy Chavez would have explained the reason for the stop, advised Defendant to re-tape the temporary tag more securely, and "[i]t would have been done." [Chavez testimony].

72. By contrast, Defendant testified that Deputy Chavez threatened to contact immigration authorities; I do not accept as credible Defendant's testimony in this regard.

73. Deputy Chavez testified that he did not take any action to determine whether Defendant had committed any immigration-related violation.

74. I find and accept as credible Deputy Chavez's testimony that he arrested Defendant because Defendant had concealed his identity and not because he believed Defendant had committed an immigration-related offense.

75. I find and accept as credible Deputy Chavez's testimony that, had Defendant been able to produce a license and proof of insurance, Deputy Chavez would have informed him of the reason for the stop and allowed him to continue on his way.

76. After Deputy Chavez arranged for Defendant's transportation to the Metropolitan Detention Center ("MDC"), Deputy Chavez returned to the Neon and looked at the temporary tag to get the VIN for the tow log.

77. It was only then that Deputy Chavez noticed that the tag had expired.

78. Deputy Chavez did not take a closer look at the temporary tag before this time because his main concern prior to the arrest was officer safety.

### C. The Issue of Defendant's Fingerprinting

79. Clinton Christison is an Identification/Corrections Officer with the MDC and has been employed there since February 2002.

80. Officer Christison has worked as an Identification Officer for approximately two and one-half years.

81. Officer Christison was working the night of January 26, 2007/morning of January 27, 2007 as the MDC's only assigned primary Identification Officer.

82. On the night of January 26, 2007, Officer Christison took Defendant's fingerprints because New Mexico law requires anyone arrested for concealing identity to be

fingerprinted.

83. Exhibit 1a is the back of Defendant's fingerprint card; it shows that Defendant was being charged with concealing his identity. [Exh. 1a].

84. Exhibit 1a also lists the United States as Defendant's place of birth and his country of citizenship.

85. Exhibit 1 is the front of Defendant's fingerprint card; the name of the person printed is listed as "Sergio Beltran."

86. I find that at the time Defendant was taken to the MDC for fingerprinting, he continued to conceal his identity.

87. Officer Christison testified that the offense of concealing identity is one of a number of misdemeanors considered to be "printable" offenses under both state statute and Albuquerque Police Department ("APD") guidelines, meaning he lacked discretion *not* to take Defendant's fingerprints.

88. I find that it is routine to fingerprint people arrested for having concealed identity.

89. I find and accept as credible Officer Christison's testimony that his fingerprinting of Defendant was done as part of a routine administrative procedure.

## II. LEGAL ANALYSIS AND CONCLUSIONS OF LAW

Defendant argues that Deputy Chavez's stop of the white Neon on the night of January 26, 2007 was pretextual because the temporary tag was attached in a manner that made it clearly visible and, thus, was in compliance with applicable traffic regulations. Because the traffic stop was without legitimacy, contends Defendant, all evidence obtained

thereafter (including but not limited to Defendant's fingerprints and evidence of his identity) must be suppressed as poisoned fruit of that illegality. [See generally Doc. 17].

The Government responds that the stop was valid because Deputy Chavez had a reasonable articulable suspicion that the vehicle's temporary tag was improperly displayed. Alternatively, the Government argues that, even if this Court deems the stop unlawful, evidence procured as a result should not be suppressed both because it was routinely obtained and would have inevitably been discovered. [See generally Doc. 23]. Because I agree that Deputy Chavez had a reasonable articulable suspicion to stop Defendant, I do not reach the Government's alternative arguments.

### A. The Initial Stop of the Neon

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The detention of a driver, however brief, during the course of a routine traffic stop constitutes a seizure within the meaning of the Fourth Amendment." United States v. Edgerton, 438 F.3d 1043, 1047 (10th Cir. 2006) (*citing* United States v. Bradford, 423 F.3d 1149, 1156 (10th Cir.2005)). The constitutionality of such a stop and resulting detention is evaluated by reference to Terry v. Ohio, 392 U.S. 1, 19-20 (1968). Where the historical facts giving rise to the stop and detention are undisputed, the only question is one of law, namely, whether the stop and detention, considered in light of the totality of the circumstances, were reasonable. See United States v. Dennison, 410 F.3d 1203, 1207 (10th Cir. 2005). A traffic stop is reasonable at its inception if the detaining officer, at the very least, reasonably

suspects the driver has violated the law. "Reasonable suspicion" is something more than a hunch, but "'considerably less' than proof of wrongdoing by a preponderance of the evidence." Id. at 1207-08. Unless the officer has an objectively reasonable suspicion that illegal activity unrelated to the stop has occurred or the driver otherwise consents to the encounter, the resulting detention is reasonable only so long as the officer's subsequent conduct is reasonably related in scope to the circumstances which justified the initial stop. See United States v. Williams, 403 F.3d 1203, 1206 (10th Cir. 2005). Thus in a routine traffic stop, an officer may request a driver's license, vehicle registration, and other required papers; run necessary computer checks; and then issue any warning or citation. United States v. Gregoire, 425 F.3d 872, 879 (10th Cir. 2005). Once those tasks are completed, however, a driver must be allowed to proceed on his way unless (1) reasonable suspicion exists that the driver is engaged in criminal activity, or (2) the driver consents to additional questioning. Id. In other words, once the purpose of the stop is satisfied and any underlying reasonable suspicion dispelled, the driver's detention generally must end without undue delay. See United States v. Millan-Diaz, 975 F.2d 720, 721-22 (10th Cir.1992).

"[A] vehicle's apparent failure to display some form of visible license plate/registration tag, temporary or permanent, gives rise to a reasonable suspicion that its driver might be violating 'any one of the multitude of applicable traffic and equipment regulations of the jurisdiction.' " Edgerton, 438 F.3d at 1048 (*quoting* United States v. DeGasso, 369 F.3d 1139, 1143 (10th Cir.2004)); see also United States v. Cano, 2006 WL 2620041, at *5 (D.Kan., Aug 25, 2006). Indeed, the applicable New Mexico statute

provides, in pertinent part, that

> [t]emporary demonstration plates and temporary permits shall be firmly affixed to the inside left rear window of the vehicle to which it is issued, unless such display presents a safety hazard or the temporary permit is not visible or readable from that position, in which case, the temporary permit shall be displayed in such a manner that it is clearly visible from the rear or left side of the vehicle.

N.M. STAT. § 66-3-18(B) (2005).

In Edgerton, the Tenth Circuit upheld the nighttime stop of the defendant's car on the basis of the detaining Kansas State Trooper's reasonable suspicion that the vehicle failed to display some form of visible license plate/registration tag, either temporary or permanent. Edgerton, 438 F.3d at 1048. This suspicion, however, would have to have been dispelled once the trooper approached the vehicle and saw that the tag was, consistent with Kansas law, "in a place and position to be clearly visible." Id. at 1051. At that point, the trooper, "as a matter of courtesy, should have explained to Defendant the reason for the initial stop and then allowed her to continue on her way without requiring her to produce her license and registration." Id. Noting that "the *only* reason the registration tag's 'manner of display' was purportedly unlawful in [Edgerton] was because 'it was dark out' and [the trooper] could not see or read it[,]" the Court "decline[d] to require optimal viewing conditions before compliance with a statute requiring an otherwise unremarkable license plate to be 'clearly visible' is assured." Id. at 1050-51 (emphasis added).

The facts were similar in United States v. McSwain, where the Tenth Circuit explained that the purpose of a stop was satisfied once the arresting Utah State Trooper

14

approached the suspect vehicle on foot and observed that the temporary sticker that he was unable to read from his patrol unit was valid and unexpired. United States v. McSwain, 29 F.3d 558, 561 (10th Cir. 1994). Importantly, McSwain distinguished those "situations in which the officer, at the time he or she asks questions or requests the driver's license and registration, still has some objectively reasonable articulable suspicion that a traffic violation has occurred or is occurring." Id. In those cases, a detaining officer may inquire about identity and travel plans, request a driver's license and vehicle registration, run a computer check, and issue a citation. Id.

In this case, the Court concludes that the credible evidence establishes that the temporary tag at issue was not firmly affixed to the rear window of the Neon when the vehicle was stopped by Deputy Chavez on the night of January 26, 2007. To the contrary, the credible testimony demonstrates that the tag was taped to the Neon's rear window at only one edge, with the remaining three edges hanging or dangling, in violation of N.M. STAT. § 66-3-18(B), which provides, in pertinent part, that "[t]emporary demonstration plates and temporary permits shall be firmly affixed . . . ." N.M. STAT. § 66-3-18(B) (2005). Consequently, at the time Deputy Chavez approached Defendant he "still ha[d] some objectively reasonable articulable suspicion that a traffic violation ha[d] occurred or [was] occurring." McSwain, 29 F.3d at 561. Deputy Chavez therefore remained within constitutional bounds when he inquired about Defendant's identity; requested a driver's license, vehicle registration, and proof of insurance; and ran a computer check. Id.

Ths instant facts are similar to those recently presented in the District of Utah. In an

unpublished opinion issued May 14, 2007, Judge Ted Stewart distinguished Edgerton and McSwain in denying a motion to suppress after finding that credible evidence demonstrated that a temporary tag, visible in a court-offered photograph because of the flash camera with which it was taken, was not visible to the arresting officer as he approached with his headlights shining on the vehicle's back window.  United States v. Jackman, 2007 WL 1448130, *1 (D. Utah, May 14, 2007) (unpublished opinion).  Because Judge Stewart found that the tag was not legible to the officer as he approached the defendant's vehicle, he also found that the officer properly detained the defendant, as the officer continued to have an objectively reasonable suspicion that a traffic violation was occurring, namely, that the vehicle was not validly registered.  For that reason, the extended detention to request and check the defendant's driver's licence, proof of insurance, and registration did not violate the Fourth Amendment.  Id. at *3.

Such is the situation here.  Because the temporary tag attached to the Neon that Defendant was driving was not firmly affixed, as mandated by N.M. STAT. § 66-3-18(B) but, instead, was dangling by one edge,[1] Deputy Chavez continued to have an objectively reasonable suspicion that a traffic violation was occurring as he approached Defendant to speak with him.  That reasonable suspicion in turn authorized Deputy Chavez to (1) ask the routine questions he asked about Defendant's identity; (2) request Defendant's driver's license, proof of insurance, and vehicle registration; and (3) run a computer check.  See

---

[1] An item may fairly be described as "firmly" affixed if it is "not easily moved or disturbed."  By contrast, an item is dangling if it is "hang[ing] loosely . . . so as to be able to swing freely."  MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 292, 438 (10th ed. 1999).

16

McSwain, 29 F.3d at 561. When Defendant failed to supply a driver's license,[2] certificate of registration,[3] or proof of insurance, Deputy Chavez asked Defendant's name and attempted to confirm identity and right to operate the vehicle by entering both the date of birth and the name Defendant provided, Marcos Gutierrez, into his MDT.  When he did so, he learned of a possible warrant for Marcos Gutierrez.  The year of birth Defendant gave did not match the year on the warrant.  Deputy Chavez then asked Defendant to repeat the information and this time Defendant gave a year of birth that did match the year on the warrant.  At that point, Deputy Chavez had two identifiers (name and date of birth) and he placed Defendant in handcuffs.  Hoping to secure "that magical third identifier," however, Deputy Chavez contacted Defendant's wife, Lilliana Veleta.  After Ms. Veleta identified Defendant as "Sergio," Deputy Chavez arrested him for concealing identity.[4]  Deputy Chavez did not

---

[2] In New Mexico, state law "require[s] every New Mexico driver to carry a driver's license and exhibit it on demand." State v. Andrews, 934 P.2d 289, 291 (N.M.App. 1997) (*citing* N.M. STAT. 1978 § 66-5-16 (Repl.Pamp.1994) ("Every licensee shall have his driver's license in his immediate possession at all times when operating a motor vehicle and shall display the license upon demand of a magistrate, a peace officer or a field deputy or inspector of the division.").

[3] See N.M. STAT. 1978 § 66-3-13 ((Repl.Pamp.1994) ("Every owner, upon receipt of registration evidence, shall write his signature thereon in a space provided. Every such registration evidence or duplicates thereof validated by the division *shall be exhibited upon demand of any police officer*) (emphasis added).

[4] Concealing identity consists of concealing one's true name or identity, or disguising oneself with intent to obstruct the due execution of the law or with intent to intimidate, hinder or interrupt any public officer or any other person in a legal performance of his duty or the exercise of his rights under the laws of the United States or of this state.

Whoever commits concealing identity is guilty of a petty misdemeanor.

17

attempt to identify Defendant as an individual in violation of immigration laws.  Defendant, however, was transported to the MDC where he was fingerprinted as required by state law and APD procedure.[5]  This fingerprinting was done as part of a routine booking procedure and ultimately led to the discovery of Defendant's identity, which he now seeks to suppress as tainted fruit of a Fourth Amendment violation (*i.e.*, a pretextual traffic stop).  However, because the Court concludes that Deputy Chavez's stop of the white Neon on the night of January 26, 2007 remained within constitutional limits, the evidence secured as a result is not subject to suppression.

## III. CONCLUSION

For the foregoing reasons, *Defendant's Motion to Suppress and Memorandum in Support Thereof* is denied.

**IT IS, THEREFORE, ORDERED** that *Defendant's Motion to Suppress and Memorandum in Support Thereof* [Doc. 17] is **DENIED**.

**SO ORDERED** this 14th day of September, 2007, in Albuquerque, New Mexico.

        **M. CHRISTINA ARMIJO**
        United States District Judge

---

N.M. STAT. § 30-22-3 (Repl.Pamp. 1994).

[5] Exhibit 1 and Exhibit 1a, the front and back sides of Defendant's fingerprint card, respectively, reveal that he continued to conceal his identity during the fingerprinting process. Exhibit 1 lists Defendant's name as "Sergio Beltran," and Exhibit 1a shows the United States as both his place of birth and his country of citizenship. [Exh. 1, 1a].